Filed 7/29/22  S.S. v. Superior Court CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| S.S.,<br><br>   Petitioner,<br><br>  v.<br><br>THE SUPERIOR COURT OF LOS ANGELES COUNTY,<br><br>  Respondent;<br><br>LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>  Real Party in Interest. | B317892<br><br>(Los Angeles County Super. Ct. No. 20CCJP01104A) |

ORIGINAL PROCEEDING; petition for extraordinary writ.  Lisa A. Brackelmanns, Judge Pro Tempore.  Petition denied.

Nicole J. Johnson and Xavier Rosas for Petitioner.

No appearance for Respondent.

Dawyn R. Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, and Jacklyn K. Louie, Principal Deputy County Counsel, for Real Party in Interest.

Stanley Wu for Minor J.S.

The juvenile court assumed dependency jurisdiction over then-four-month-old J.S. and removed him from the custody of his mother S.S. (Mother) based on the court's finding that Mother suffered from mental and emotional problems that inhibited her ability to regularly care for her very young son. The court's order for reunification services required Mother to undergo a psychological evaluation and participate in individual counseling. At the 12-month review hearing, the juvenile court terminated Mother's family reunification services and set a permanency planning hearing. In this extraordinary writ proceeding challenging the setting of that hearing, we consider whether substantial evidence supports the juvenile court's finding that the Los Angeles County Department of Children and Family Services (the Department) provided Mother with reasonable reunification services before those services were ordered terminated.

## I. BACKGROUND

### A. *The Department Investigates J.S.'s Welfare*

In February 2020, the Department received a report about concerning behavior by Mother at the hospital where she had just given birth to J.S. According to the reporting party, Mother had been aggressive and threatening towards the nursing staff, tried to leave with J.S. against medical advice, and refused a toxicology test. A hospital psychiatrist "[did] not have enough to place [Mother] on a psychiatric hold," but believed Mother was schizophrenic.

A Department social worker visited the hospital. Mother was interfering with J.S.'s newborn screenings, "refusing to allow the examinations, yelling, cursing, and insulting medical staff."

The social worker attempted to calm Mother down and explained the Department needed to know she was prepared to handle the responsibilities of a newborn. Mother shouted "leave me alone," and the social worker left the room. A hospital social worker then entered Mother's room, but Mother told her to "get out." A psychiatrist re-evaluated Mother and determined that she "appeared to exhibit cluster traits, low distress tolerance, and possibly borderline personality disorder."

Later, Mother yelled at a nurse who was performing a newborn screening test and told her to leave. The hospital psychiatrist was called in again. He said he would need more time to determine Mother's capacity to care for J.S. but there was a "risk factor" due to Mother's "'low distress tolerance and anger aggression.'" A doctor opined Mother's actions were interfering with the standard care of J.S. The Department obtained an order removing J.S. from Mother's custody.

In the Department's investigation that ensued, a social worker spoke to Mother. She said that part of her income comes from "Social Security Insurance" and that "her disability is Anxiety and Depression during her pregnancy." Mother said she had been following a mental health professional's recommendation "when she was 16, but not now." Mother claimed she no longer needed counseling.

Treatment notes from Mother's hospital stay when giving birth to J.S. mention a history of schizophrenia, citing "[c]ollateral history" obtained from Mother's shelter. The notes add that Mother "denies this history when she is confronted." The notes also state that the schizophrenia is "apparently untreated at this time."

4

Department records indicated Mother had also been admitted to a hospital for "drug induced [p]sychosis" less than three years earlier, in May 2017. She was treated and discharged after nearly a month. Less than a week after her discharge, however, Mother was treated at a different hospital for "suicidal thoughts and Bi Polar." After that hospital stay, Mother had a mental health assessment and an intake appointment, but decided she no longer wanted mental health services. The following week, Mother was admitted to another treatment center and discharged with a prescription for medication. Within a month, Mother "stated that she was feeling fine and back to her old self and stopped taking the medication," but she said she would resume taking the medication if she began "having bad thoughts."

B.     *The Dependency Court Takes Jurisdiction Over J.S.*

The Department filed a juvenile dependency petition alleging Mother "has mental and emotional problems, including cluster traits, low distress tolerance and possible borderline personality disorder and a diagnosis of anxiety, depression and schizophrenia, which renders the mother incapable of providing regular care for the child. The mother failed to obtain recommended mental health treatment. Such mental and emotional problems on the part of the mother, endangers the child's physical health and safety and places the child at risk of physical harm, damage, and danger."

The court held a detention hearing in February 2020. The court detained J.S. from Mother and released him into the Department's custody. Mother was permitted monitored visitation.

In April 2020, Mother informed the Department she completed a mental health evaluation and was prescribed three medications for anxiety. She said she was told she was bipolar and had postpartum psychosis. Mother said she took the medication once and, after that, told the doctor she didn't need medication. Mother said she would be receiving individual counseling. She denied being diagnosed with mental health problems during her prior hospitalizations and claimed she had been admitted because she was "homeless and doing substances." (She refused to say what substances she had been using at that time.) With regard to her behavior at the hospital after giving birth to J.S., Mother said she had been upset with her siblings for not helping her when they were visiting and raised her "voice a little bit" at a nurse.

In June 2020, the juvenile court sustained (with certain amendments by interlineation) the aforementioned dependency allegations and ordered monitored visitation for Mother. The disposition hearing was scheduled to take place later.

In the interim before the disposition hearing, Mother told a social worker not to call her anymore because she did not require assistance and was "well aware" the social worker was not willing to help her. When asked if she had been following up with her psychiatrist and taking her medication, Mother responded, "'It's none of your business if I am, plus I don't need to take medication. All I needed to do was take the assessment and I did that, so there, I'm doing what I need to do.'"

Not long thereafter, Mother was involuntarily hospitalized pursuant to Welfare and Institutions Code section 5150. The involuntary hospitalization was triggered because Mother was threatening other residents of the shelter where she lived and

refused to leave the shelter. Mother was released from the hospital the next day and allowed to return to the shelter. The shelter manager reported that Mother had been "unstable the entire week."

There were also problems with Mother's visitation. In July 2020, a visitation monitor terminated a visit when Mother became "very loud, angry, and confrontational" after being advised against overfeeding J.S. On another occasion, Mother was shouting obscenities at a passerby during a visit with J.S. at a park, yelling at the visitation monitors, and cursing at J.S.'s foster mother. In August 2020, Mother told the Department she was asked to leave her shelter after a fight with staff and her roommate. Mother was in "good spirits" and in a "positive mood" for two later visits, however, stating she was taking her medication daily and was feeling better and less anxious.

Shortly before the disposition hearing, the Department submitted a report to the juvenile court attaching a September 2020 progress letter from Dr. Robert Strong, who had been having weekly teletherapy sessions with Mother since May. According to the letter, "[Mother's] treatment goal was related to reducing panic attacks (that often look like angry outbursts to the untrained eye) from multiple times/wk to less than weekly. [Mother] worked . . . on learning and applying coping skills, which she worked hard at to employ in the conflicts that would emerge with women at [Mother's shelter] that were reportedly critical and aggressive. And when she was relocated to a calmer shelter, her anxiety went down dramatically." According to Dr. Strong's letter, "[Mother] has been working with a psychiatrist at our clinic," and she felt "the medication was helping her have more even moods and clearer thinking."

At the disposition hearing held in October 2020, the court declared J.S. a dependent of the court and ordered that he be placed in foster care. The court also ordered family reunification services for Mother, including parenting classes, transportation and housing assistance, and mental health treatment—specifically, an order for a psychiatric evaluation, a direction to take all prescribed psychotropic medication, and a requirement to participate in individual counseling.

C. *Subsequent Developments, and the Six-Month Review Hearing*

A Department social worker called Mother in December 2020 to discuss visitation with J.S. and provide assistance with transportation, housing, and funding for programs. Mother refused assistance from the Department.

During a subsequent phone call with Mother, a social worker heard Mother and J.S.'s alleged father arguing. The Department later met with Mother and suggested enrolling in a domestic violence class. The Department also informed mother it could not provide financial assistance payments to her because she was already receiving social security payments.

Dr. Strong (Mother's therapist) authored another progress letter regarding Mother in February 2021. Insofar as the letter described Mother's condition, it was identical to his prior letter prepared in advance of the disposition hearing. This letter, however, also included a jeremiad about social welfare systems and their treatment of people of color: "From my observations and from current sociological study, black mothers are subject to negative attributions from social workers and medical professionals, at a highly disproportionate rate. [¶] . . . [¶] I have

8

watched [Mother] attempt everything asked of her with no support or financial resources. She tried attending a certificate-program at a local college and tried to take online parenting classes, all while struggling with finances and transportation. This young lady has a great amount of trauma that clouds her mind regularly, and treatment by our racist healthcare system has caused a great deal of it. She has already been robbed of the irreplaceable first key year of bonding with her baby. [¶] . . . [¶] I will advocate for her as much as I can against this implacably biased system that traumatizes black families on a regular basis. I was written up by my county clinic last year for complaining of similar systemic biases, because I had offended some privileged, Caucasian social worker. This was the same month I was shot with rubber bullets for protecting a sister of color from the police officers that were dragging her across the pavement and beating her. The fear of institutions and uniforms has been beaten out of me. So, professionalism be damned. Those in positions of power who ignore and thereby perpetuate this sort of human suffering by a racist and oppressive system, those are the ones who should be sleepless with fear and remorse, for the spiritual karma that will inevitably come to them in this world or the next."

The Department submitted the letter to the juvenile court as part of a status update report in advance of the six-month review hearing. The Department's report opined Dr. Strong's letter was "inappropriate" and demonstrated Dr. Strong "wants to serve more as an advocate . . . than her therapist." The Department's report stated the Department would search for a more appropriate therapist in the months to follow.

By March of 2021, Mother told a Department social worker she was taking new medication prescribed by her psychiatrist Dr.

William Kaz (the psychiatrist working at the same clinic as Dr. Strong) and was experiencing "problems" with the new medication. Mother provided a letter from her residential case manager explaining Mother had been transported to the hospital after having an adverse reaction to the new medication. The social worker advised Mother to contact her doctor to have her medication reevaluated.

At the six-month review hearing, held in April 2021, the juvenile court found the Department had provided Mother with reasonable services. The court further found that Mother had made partial progress with her case plan and ordered reunification services to continue.

### D. The Twelve-Month Review Hearing and Termination of Reunification Services

Visitation problems continued after the six-month review hearing. At one visit in May 2021, J.S.'s foster mother reported Mother said she did not take her medication. A June 2021 visit had ended with the police being called when Mother "was acting out of control," and "cussing and screaming" in front of J.S. As a result, a Department social worker, J.S.'s foster mother, and the foster family social worker met with Mother and she was agitated and used profanity throughout the meeting. Mother was asked if she was keeping Dr. Strong apprised of any mental health issues and she said that Dr. Strong was not helping her. The Department social worker said he would talk to Dr. Strong about Mother's concerns.

Dr. Strong thereafter sent an e-mail to a Department social worker stating Mother "has fulfilled all of her other requirements, finished anger management and parenting classes,

participated in individual therapy[.] What's the latest from your end? What's the hold up for reunification?" The social worker informed Dr. Strong of the recent meeting in which Mother used profanity and "refused to listen to reason."

Dr. Strong provided a final progress letter in September 2021. The letter contained identical statements as the previous letters about Mother's treatment goals, her feelings about the effect of her medication, and life updates. Dr. Strong also expressed skepticism about the justification for J.S.'s removal: "It has also been confirmed recently, that the hospital used a false diagnosis to justify snatching her baby from her breast, stating that she is schizophrenic, which hours of assessment and therapy can confirm, [she] is not. . . . A vicious cycle often takes place with Black women when scrutinized by authority figures, that they will react out of anxiety, based on years of systemic racism, only to find that very anxiety response used against them." Dr. Strong stated "[Mother] has done everything asked of her," including individual parenting and anger management classes, and a vocational training program. The letter closed: "I hope the reunification of this mother with her child can be done as soon as possible, so that not another minute of this formative developmental phase be lost. [¶] Until she is reunified with her child, she cannot be expected to act any other way than distraught. I am reminded of the words of Jesus, who lambasted the authorities of his day for 'binding burdens upon other men's backs that they themselves could never carry.' I hope she receives justice for the medical crimes committed against her and her child."

Before the 12-month review hearing, a Department social worker asked Mother why Dr. Strong did not include information

11

concerning her medication and housing in his progress letter. Mother said that when she asked Dr. Strong to include that information, he refused. Mother discussed enrolling in a second individual counseling program, but the Department pointed out she was receiving treatment from Dr. Strong and that she was not ordered to enroll in a second individual counseling program. Mother also reported she was still taking her medication under the supervision of Dr. Kaz. The Department asked Mother about "where she was currently living, the contact information of her case manager, her employment internship, and a progress letter from Dr. Kaz," but, according to the Department, she "was not able to confirm any of the questions asked of her." The Department called Dr. Kaz to discuss Mother's progress with managing her medications but was unable to leave a message.

The Department did reach Mother's anger management and parenting class program facilitator, who reported that Mother had completed 28 sessions of a 16-session parenting course and 27 sessions of a 16-session anger management course.[1] A week later, the executive director of the facility offering the anger management classes reported Mother "had a meltdown" during a class when she was told the Department recommended she continue anger management classes.[2] The executive director did not know if Mother was taking her medication.

---

[1] The Department and the program facilitator had decided in July 2021 that Mother needed more sessions "to gain a better insight."

[2] According to the Department, a social worker told Mother she could cease participation in the classes but was free to continue if she needed additional help.

In a last minute information report submitted before the 12-month review hearing, the Department stated Mother had been advised in June 2021 that the Department could pay for court ordered services but she had "refused every month from June 2021 through October 2021." The report also revealed one monitored visit between Mother and J.S. had to be terminated because of Mother's "assaultive and aggressive behavior towards the monitor." According to the report, Mother met with a Department social worker in December 2021 and provided an enrollment and progress letter for a new anger management program, copies of recently filled prescription medications, and materials detailing her efforts to search for housing.

At the 12-month review hearing, Mother asked the juvenile court to return J.S. to her custody or, failing that, to continue reunification services. Mother argued she completed "her entire case plan" (meaning programs, counseling, taking medication as prescribed, and visiting J.S.). Mother acknowledged the Department was recommending termination of reunification services but argued the recommendation was made "because the social worker was not happy with [Mother's] attitude."

The attorney for J.S. urged the court to terminate reunification services. Counsel argued: "Mother has done everything in the case plan and yet it's not enough. She completed additional anger management classes, . . . [s]he's still not able to control her anger." Counsel also argued that despite parenting classes, Mother was "unable to care for [J.S.'s] needs during monitored visitation." The Department likewise argued reunification services should be terminated.

The juvenile court stated it was "sympathetic" to Mother, as she "seems to be going to her classes and wants to reunify

13

with" J.S. But the court observed that "Mother, in her behaviors not only at visits but in interactions with the social worker and the caregiver, is not showing a change in her behaviors that brought her before this court. Her mental health issues still are an ongoing issue and are manifesting itself in terms of her angry outbursts." The court found the Department provided reasonable reunification services but "Mother has not made significant progress in resolving the problems that led to [J.S.]'s removal from the home, and Mother has not demonstrated the capacity and ability to complete the objectives of the treatment plan and to provide for the child's safety, protection, physical and emotional well-being." The court accordingly terminated reunification services and set a permanency planning hearing pursuant to Welfare and Institutions Code section 366.26.

## II. DISCUSSION

Mother argues the juvenile court's reasonable services finding is unsupported by the evidence and asserts the Department should have sought out more detailed information about her mental health diagnosis and replaced Dr. Strong as her therapist. As we go on to explain, the specific contention about replacing Dr. Strong is waived for failure to raise that issue in the juvenile court and the broader assertion that there is no substantial evidence supporting the reasonable services finding does not jibe with our view of the record. The Department identified the problems leading to Mother's loss of custody; offered numerous services designed to remedy those problems; and maintained ongoing contact with Mother, which included offering assistance when she demonstrated issues with compliance. It is well-settled that services provided need only be

14

reasonable, not perfect or even ideal, and the Department's efforts were more than adequate under that standard.

If a juvenile court removes a child from parental custody and assumes dependency jurisdiction under Welfare and Institutions Code section 300, the court may require the Department to provide reunification services to the parent and order participation in a counseling program "designed to eliminate those conditions that led to the court's finding that the child is a person described by [Welfare and Institutions Code,] [s]ection 300." (Welf. & Inst. Code, § 362, subd. (d); see also Welf. & Inst. Code, § 361.5, subd. (a).) The court then monitors compliance with reunification services at periodic hearings.

The Department "must make a good faith effort to provide reasonable services responsive to the unique needs of each family, and the plan must be . . . ""designed to eliminate those conditions which led to the juvenile court's jurisdictional finding."" [Citation.]" (*Patricia W. v. Superior Court* (2016) 244 Cal.App.4th 397, 420 (*Patricia W.*).) The Department's efforts are judged according to the circumstances of the particular case. (*Amanda H. v. Superior Court* (2008) 166 Cal.App.4th 1340, 1345; see also *In re Misako R.* (1991) 2 Cal.App.4th 538, 547 (*Misako R.*).) "Services will be found reasonable if the Department has 'identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained reasonable contact with the parents during the course of the service plan, and made reasonable efforts to assist the parents in areas where compliance proved difficult . . . .' [Citation.]" (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 972-973.)

We review a juvenile court's finding that reasonable services were provided for substantial evidence, considering the

15

record in the light most favorable to the Department and in light of the clear and convincing standard of proof that applies in the juvenile court. (*Patricia W., supra*, 244 Cal.App.4th at 419; see also *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005, 1011.)

Substantial evidence supports the juvenile court's reasonable services finding. Mother received a mental health evaluation and a diagnosis. She was being treated by a psychiatrist who prescribed medication to treat her mental illness. She was also referred to, and attended, parenting, domestic violence, and anger management classes. The Department further offered Mother resources for locating housing and transportation funding, maintained regular contact with Mother throughout the reunification period, made suggestions to help her with her case plan compliance, and attempted to mediate conflicts between her and J.S.'s foster mother. These are reasonable efforts to eliminate the basis on which the juvenile court assumed jurisdiction over J.S. As the juvenile court recognized in its remarks at the 12-month review hearing, that these efforts did not ultimately succeed in transforming Mother's behavior to enable reunification was largely a function of her intransigence (indeed, she expressly refused the Department's assistance at times), not the absence of efforts made by the Department.

The only specific counterargument Mother offers to the contrary is the claim that the Department cannot be found to have provided reasonable services because it did not replace Dr. Strong as Mother's therapist and did not otherwise to obtain more information about her mental health diagnosis. The point concerning Dr. Strong, however, is waived. Mother's attorney in the juvenile court was well aware of the content of Dr. Strong's

16

progress letters, the Department's view that the letters were inappropriate, and the Department's statements that it would search for another therapist for Mother. Despite that awareness, Mother's attorney never objected to Dr. Strong's continued service as her therapist and this is easily understood as a tactical judgment—Dr. Strong was a vocal, steadfast advocate for Mother (even if unprofessional to a degree) and there was no guarantee a new therapist would be as strongly in her corner. (See *In re S.B.* (2004) 32 Cal.4th 1287, 1293, fn. 2 ["waiver is the "'intentional relinquishment or abandonment of a known right'""].) Furthermore, Mother was also under the continued care of her psychiatrist, Dr. Kaz, who was prescribing her medication. So even if the Department should have done more to search for a new therapist (and even if Mother would have then accepted a new therapist) or tried to obtain more information about Mother's mental health diagnosis, the absence of evidence that the Department did so does not defeat a reasonable services finding. (*Misako R.*, *supra*, 2 Cal.App.4th at 547 ["The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances"].)

DISPOSITION

The petition for extraordinary writ is denied.


NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


BAKER, J.

We concur:



RUBIN, P. J.



MOOR, J.